**AFFIRMED as MODIFIED and Opinion Filed April 15, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-01121-CV

## CLARKE BARCUS, C-2 IT RENTAL, INC.,
## 440 EQUIPMENT, LLC AND CYRUS BARCUS, Appellants
## V.
## SARAH SCHARBAUER, Appellee

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-08105**

## MEMORANDUM OPINION
Before Justices Myers, Nowell, and Evans[1]
Opinion by Justice Evans

After a non-jury trial, appellants Clarke Barcus, C-2-It Rental, Inc., 440 Equipment, LLC, and Cyrus Barcus appealed an adverse judgment in favor of appellee Sarah Scharbauer.[2] The principal amounts comprising the judgment were $461,000 against Clarke for breach of contract for failing to repay Sarah's loans to him; $250,000 against 440 Equipment for breach of contract for failing to repay

---

[1] The Honorable David Evans, Justice of the Court of Appeals for the Fifth District of Texas—Dallas, Retired, sitting by assignment.

[2] The Court will refer to the individuals by their given names to distinguish the son, Clarke Barcus, from his father, Cyrus Barcus. We, therefore, similarly refer to Sarah by her given name.

Sarah's loan to it; and $142,112 against Clarke and Cyrus for fraud and conspiracy to commit fraud related to Sarah's purchase of artwork. When Clarke testified, he admitted Sarah loaned him $461,000, Sarah advanced $250,000 to 440 Equipment which 440 Equipment treated as a loan, and Sarah paid $355,000 to Clarke and Cyrus for the artwork. The trial court evaluated three-days of evidence and determined $142,112 was the appropriate damage amount for the fraud pertaining to the artwork. The trial court further determined the parties agreed to the loans with interest; the loans did not have repayment dates making them demand loans under Texas law; and demand was made but the loans were not repaid, which constituted Clarke and 440 Equipment's breach of the loan agreements. The trial court found Clarke, 440 Equipment, and C-2-It were alter egos and held them jointly and severally responsible for the contractual damages awarded in the judgment. The trial court also granted judgment against appellants' various counterclaims.

Appellants do not dispute Clarke and 440 Equipment borrowed and owe $461,000 and $250,000, respectively. Nevertheless, they assert we should reverse the judgment because there is no evidence of: the contracts Sarah pleaded, appellants' breach of the contracts, or that Clarke, 440 Equipment, and C-2-It are alter egos (issues 1 & 2); the trial court erred in dismissing their counterclaims for breach of contract and unfair debt collection (issue 3), and there is no evidence of fraud, damages, or conspiracy regarding the artwork transaction (issue 4).

2

Appellants raise a fifth issue which, as noted below, we need not address. We strike from the judgment the paragraph awarding alternative, lesser damages for unjust enrichment and money had and received, but otherwise, for the reasons explained below, we affirm the judgment. We issue this memorandum opinion because the facts are well known to the parties and the issues of law are settled. *See* TEX. R. APP. P. 47.4.

## I.
### FACTUAL BACKGROUND

The trial began when Sarah called Clarke adversely as the first witness:

Q. [by Sarah's lawyer]. So you acknowledge, admit, and agree that you owe her $461,000?

A [by Clarke]. I agree.

Q. You are obligated to pay that back to her, right?

A. I agree.

Q. With regard to your company, 440 Equipment, that entity accepted from her $250,000, correct?

A. Correct.

Q. You have booked it and treated it as a loan, correct?

A. Yes.

Q. You agree that 440 Equipment is obligated to pay her that $250,000 back, right?

A. Yes.

. . .

3

Q. And so absent that reclassification [of any loans as equity in 440 Equipment or C-2-It], you and 440 collectively owe her $711,000 today, right?

A. Yes.

Q. And you're obligated to repay that, right?

A. Yes.

Clarke repeated these admissions twice more in his testimony and also admitted he falsely answered an interrogatory when he denied owing more than $15,000. Clarke further conceded that he and his father sold Sarah six pieces of art for which she paid $355,000. Clarke did not, however, admit the fraud, damages, or conspiracy Sarah alleged regarding the artwork.

Sarah's loans and purchases of artwork resulted from Sarah hiring Clarke to renovate her house in Irving, Texas. They became social friends and texted a lot about work and personal matters. One of the loans Sarah made to Clarke was the purchase of a trip to the Super Bowl for him. Clarke informed Sarah he was experiencing financial difficulties and asked to borrow money, so Sarah successively lent Clarke and 440 Equipment increasing amounts of money. Although Sarah wrote, "Personal Loan," in the memo line on checks to Clarke, in the memo line of the checks to 440 Equipment Sarah wrote, "Contribution" and "Capital." 440 Equipment treated the funds as loans for accounting purposes and did not issue any equity interest to Sarah, although the possibility of doing so was discussed.

4

Sarah and Clarke orally discussed the loans and exchanged emails, text messages, checks, and other documents pertaining to the growing balances of the loans, but never executed formal loan agreements. Appellants' and Sarah's bank records confirm the amounts. In the communications, Sarah and Clarke acknowledged to one another the increasing loan balances owed but did not provide a repayment date or state the loans were demand loans. In the exchanged documents, Clarke promised the loans would be repaid with interest and that he hoped his business would succeed so well he could pay Sarah more based on the amount of earnings. Sarah made numerous attempts to obtain Clarke's agreement to more formal loan terms for all the loans, but she encountered difficulty engaging Clarke in such discussions. Clarke testified later at trial, however, he thought because there was no due date, he could repay the loans whenever he wanted, including choosing not ever to do so.

In August 2016, Clarke and 440 Equipment needed more money, so Clarke offered to sell one of his paintings hanging in his father-in-law's house and one of Cyrus's paintings. Eventually, the transaction included Clarke's painting and five of Cyrus's paintings hanging in Cyrus's house for prices that aggregated to $355,000 ($60,000 for Clarke's painting and $295,000 for Cyrus's five paintings). The parties agreed the paintings would remain where they were located but Sarah could obtain them on twenty-four hours' notice. Sarah testified Clarke assured her he and Cyrus

5

had appraisals supporting the prices for the artwork. Sarah further testified neither Clarke or Cyrus revealed to her Cyrus had tried to sell his artwork at a 2012 auction with reserves at or below the prices Sarah was paying but no acceptable bids were made. Sarah paid Clarke and Cyrus $355,000, and as agreed, the paintings stayed where they were. Thereafter, Clarke made a $20,275 interest payment on his loans based on his calculation, and 440 Equipment repaid its $100,000 loan.

Negotiations about formalizing the loans continued. On January 11, 2017, Clarke emailed Sarah stating, "Please let me know what you think," attaching an unsigned, three-page, "Informal Agreement," written in first person to Sarah. In the document, Clarke explained various business plans and projections and concluded by stating in the last paragraph, "No matter what, I will make sure you earn 10% interest." In January and February, Sarah advanced an aggregate of $250,000 to 440 Equipment. Later in 2017, Clarke proposed an unsigned single page agreement that provided there was no maturity date and no interest on the loans.

Clarke terminated direct discussions with Sarah about formalizing the loans in May 2017, telling her that future communications would have to be between professionals. On May 24, 2017, Sarah's accountant called Clarke and demanded payment of all loans by June 12, 2017. Sarah employed legal counsel in June who, on June 12, 2017, made demand for repayment by June 19, 2017 of the loans. Sarah filed suit on July 7, 2017. After the bench trial and adverse judgment, appellants

6

timely appealed.  Upon request, the trial court entered findings of fact and conclusions of law.

## II.
### ANALYSIS

Appellants summarize their appeal as not about the loaned money but rather the obligation to repay it on demand:

> Clarke repeatedly testified and admitted that he owes Sarah money. . . . The controversy between Sarah and the appellants is not about whether Clarke or another appellant owes her various sums of money; it is about whether they have to pay it back whenever Sarah demands it.

Or, as Clarke testified, he could repay the loans whenever he wanted to do so, which may be never:

> Q [by Sarah's attorney].  You believe there is no term for this loan, correct?
>
> A [by Clarke].  Correct.
>
> Q.  You believe you could repay it whenever you want, right?
>
> A.  I do. . . .
>
> Q.  And if whenever you want never occurs, that's fine with you?
>
> A.  I mean, it's not fine but that's—that's the term.

So, the essence of appellants' arguments regarding the loans is whether Sarah can ever obtain repayment of the money appellants admit Sarah loaned Clarke and 440 Equipment.  Appellants contend the artwork fraud and conspiracy never occurred

7

and Sarah never established the fair market value of the artwork to support her damages.

## A. First and Second Issues: Sarah's Pleading and Proof of Loan Contracts, Breach, and Alter Ego

In their first and second issues, appellants complain Sarah failed to plead the dealings between her and Clarke amounted to contracts, but instead pleaded only that three documents constituted the agreements and that they were demand loan agreements or notes that created the debt obligations. Further, appellants argue Sarah did not prove the three-document contract theory to which appellants claim Sarah's pleading limited her, and that Sarah did not prove 440 Equipment breached its loan agreements. Finally, appellants argue there is no pleading and insufficient proof of alter ego or any veil-piercing theory regarding the breaches of contract.

### *Sarah's Pleaded Theories of Breach of Contract*

In her third amended petition filed one year before trial, Sarah alleged in detail the facts about her loans to Clarke and 440 Equipment, the amounts they repaid, and the communications between the parties. She included tables listing the dates and amounts of the loans and the dates and amounts of partial repayments received. She then pleaded as her cause of action against Clarke:

> 54. Ms. Scharbauer and Clarke are parties to several valid contracts, including the May 2016 Note, the November 2016 Note, and the Super Bowl Note.

> 55. Through these agreements, Ms. Scharbauer loaned Clarke roughly $580,000.

8

56. Under the terms of the agreements, Clarke was obligated to repay the loans on demand but has failed to do so.

57. Clarke's failure to repay the loans amounts to a breach of the parties' various agreements.

Appellants did not specially except to Sarah's third amended petition.

"Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). "'A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense.'" *Id.* at 897 (quoting *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982)). Both rule 45's requirement of "a statement in plain and concise language of the plaintiff's cause of action" and rule 47's requirement that the "short statement" must "give fair notice of the claim involved" are satisfied when "the cause of action 'may be reasonably inferred from what is specifically stated.'" *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (quoting *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993)); TEX. R. CIV. P. 45, 47. "When, as here, no special exception is made, we liberally construe the pleadings in the pleader's favor." *Bos v. Smith*, 556 S.W.3d 293, 305–06 (Tex. 2018). When analyzing appellants' challenge to Sarah's pleading, we bear in mind, "Constitutional imperatives favor the determination of

cases on their merits rather than on harmless procedural defaults." *Marino v. King*, 355 S.W.3d 629, 634 (Tex. 2011).

Sarah's petition pleaded the date and amount of each loan and each partial repayment. She alleged the loans were demand obligations because they did not have a repayment or maturity date. Sarah clearly described the various agreements and exchange of communications as post-hoc documentation of her loans previously made to Clarke that Clarke promised to repay. She pleaded, "The various notes *documenting* Ms. Scharbauer's loans to Clarke included no formal due date. Clarke's debts are therefore *due on demand*." (Sarah's emphasis in her brief). Moreover, even appellants admit in their brief Sarah's allegation that, "Ms. Scharbauer and Clarke are parties to several valid contracts, *including* the May 2016 Note, the November 2016 Note, and the Super Bowl Note." (emphasis added) Use of "including" thus means appellants admit there were more agreements than just the three agreements to which appellants now seek to confine Sarah's breach of

contract theory.[3]  They also admit they knew Sarah's trial theory from her motion for summary judgment which the trial court denied.[4]

Alleging a few of the transactions were notes, even if that incorrectly named Sarah's theory, does not negate the fair notice Sarah's pleading provided that the transactions comprised of oral, electronic, and paper communications together with her checks were agreements evidencing her loans aggregating to $451,000 to Clarke who in turn was obligated to repay the debts on demand with interest.  *See Horizon/CMS Healthcare*, 34 S.W.3d at 897 (pleading gives fair notice of its theory even though it cited incorrect statute) (favorably citing and quoting *CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 586 (Tex. App.—Dallas 1991, writ denied) ("A pleading that gives adequate notice will not fail merely because the draftsman named it improperly.")).  Further, in the absence of special exceptions, the petition should be construed liberally in favor of the pleader.  *Roark*,

---

[3] Appellants state:

> In her breach of contract claim against Clarke, Sarah alleges that they "are parties to several valid contracts, including the May 2016 Note, the November 2016 Note, and the Super Bowl Note."  CR 192.  Sarah's use of the word "including" indicates that she thinks she and Clarke might be parties to agreements other than the May 2016, November 2016, and Super Bowl agreements.  However, she does not identify what the other agreements might be in her breach of contract claim against Clarke.

[4] Appellants state:

> Sarah's summary judgment motion and post-trial brief and the trial court's findings of fact and conclusions of law show that, under Sarah's theory of the case, the November 2016 agreement did nothing more than document a loan, and that the loan itself, not the November 2016 agreement, was the contract Clarke breached.

11

633 S.W.2d at 809. The fact that appellants never complained in the trial court—even in response to Sarah's post-trial memorandum—that Sarah had not pleaded the theory Sarah tried and on which she moved for judgment also indicates they were not surprised.[5]

---

[5] Sarah argues that appellants' failure to object at trial that she had a pleading defect amounted to trial by consent. *See Roark*, 813 S.W.2d at 495 ("The party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal."). Sarah argues she explained in opening statements her aggregate-of-communications contract theory of the case, then put on evidence consistent with that theory. She cites her opening statement at the bench trial in which her counsel explained the entire loan theory to the trial court:

> And it was in October of 2015, that the parties began this pattern of transactions over the course of the next 18 months where Ms. Scharbauer ultimately loaned Mr. Barcus over $450,000 individually and $250,000 to his company, 440 Equipment.
>
> . . .
>
> So what we have is a series of oral contracts to loan money between Ms. Scharbauer and Mr. Barcus and between Ms. Scharbauer and 440 Equipment. And those contracts are evidenced by various writings, which include the checks, e-mails, and some handwritten agreements that the parties put together.

Thus, Sarah argues, her theory was clearly stated and any objection to lack of pleading should have been made during trial or the theory was tried by consent.

Sarah further argues appellants' failure to assert this objection any time in the trial court is a failure to preserve their issue for appeal. *See* TEX. R. APP. P. 33.1; *Pleasant Grove Builders, Inc. v. Phillips*, 355 S.W.2d 818, 822 (Tex. App.—Dallas 1962, writ ref'd n.r.e.) ("[G]enerally a challenge to the sufficiency of the pleadings may not be raised for the first time on appeal.").

We do not agree appellants tried Sarah's theory by consent resulting from their failure to object at trial. In this case Sarah's presentation of either theory at trial would be substantially similar when she presented evidence of the facts underlying the transactions. That substantial similarity would make it nearly impossible to assert evidentiary objections to evidence supporting the unpleaded theory because the same evidence would be relevant background to both theories. Thus failure to object did not result in trial by consent. *See Hampden Corp. v. Remark, Inc.*, 331 S.W.3d 489, 497 (Tex. App.—Dallas 2010, pet. denied). Moreover, the substantial similarity also undermines appellants' complaints about Sarah's pleading as explained in the text above; that is, Sarah pleaded her claims broadly enough to give fair notice her suit encompassed both theories, and she was required to prove only one theory at trial.

Sarah's preservation argument is more troubling because appellants failed to ever inform the trial court they objected Sarah had not pleaded the case she proved and on which she moved for judgment. *See* TEX. R. APP. P. 33.1; *Seim v. Allstate Texas Lloyds*, 551 S.W.3d 161, 164 (Tex. 2018) (per curiam) ("Rule 33.1(a) requires a timely and ruled-upon objection to preserve error."); *Phillips*, 355 S.W.2d at 822. Although it appears appellants did not preserve their complaint about Sarah's pleading, we decide to resolve appellants' arguments on their merits in order to explain the error of appellants argument that Sarah's evidence was

12

We observe even the exact details of each date and amount of each loan and repayment, if any, found by the trial court in its findings of fact and conclusions of law were alleged by Sarah in her pleading.[6] She alleged in her provision of money by checks and exchange of communications with Clarke and 440 Equipment they became "parties to several valid contracts," the loans were demand loans, that Clarke and 440 Equipment breached their agreements by failing to repay the loans when demand was made therefor, and that her damages were the amounts of the loans, interest, and attorney's fees. In keeping with the constitutional imperative to decide this case on its merits rather than on technical pleading defaults—*Marino*, 355 S.W.3d at 634—we cannot conclude Sarah's third amended petition failed to provide appellants adequate notice of her breach of contract claims she presented at trial, nor were appellants deprived of the opportunity to formulate their defenses.

---

insufficient to prove appellant's view that Sarah pleaded only a three-document theory of breach of contract. To explain the sufficiency of the evidence, we have to explain Sarah's pleaded theory of the case. So, pointing out Sarah adequately pleaded her claim becomes ancillary to explaining the sufficiency of the evidence.

[6] There were two variances in the amounts of repayments between what the trial court found and Sarah's pleaded amounts. Sarah alleged a 5/10/2017 repayment was in the amount of $1,500 and a 5/25/2017 repayment was in the amount of $500 (copies of the checks in evidence corroborate those amounts). In finding of fact 10 (see text *infra*), the trial court found the repayment on each those dates was for $1,000. So, the variances between the pleading, proof, and findings of fact regarding those two repayments nets out to zero. No party complains this slight variance between the pleading (supported by the evidence) and findings of fact has any significance, and it has no impact on our analysis of the fair notice of Sarah's claims provided by her third amended petition.

13

*Sufficiency of Sarah's Evidence of the Contracts*

Appellants also argue that Sarah's evidence is insufficient to prove the three-document breach of contract claim to which appellants seek to limit Sarah's pleading. Having rejected appellants' limited reading of Sarah's third amended petition, we analyze appellants' arguments as applied to the contracts Sarah pleaded and the trial court found she proved. In addition, appellants contend there is insufficient evidence to support the finding that Sarah's advances to 440 Equipment were loans.

"A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). In an appeal from a nonjury trial in which the trial court made findings of fact and conclusions of law, appellants should challenge the sufficiency of the evidence supporting specific findings of fact rather than directing such a challenge generally at the judgment as a whole. *See Thompson & Knight LLP v. Patriot Exploration, LLC*, 444 S.W.3d 157, 162 (Tex. App.–Dallas 2014, no pet.). But where we can fairly determine from the argument which specific finding of fact the appellant challenges, failure to specify which specific factual finding is not fatal. *See Shaw v. Cty. of Dallas*, 251 S.W.3d 165, 169 (Tex. App.–Dallas 2008, pet. denied). In evaluating the legal sufficiency of the evidence to support a finding, we view the evidence in the light favorable to

the finding, indulging every reasonable inference supporting it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. The ultimate test is whether the evidence allows reasonable and fair-minded people to reach the finding under review. *See id.* "A legal sufficiency challenge fails if more than a scintilla of evidence supports the finding." *Tex. Outfitters*, 572 S.W.3d at 653. In a factual sufficiency review, we view all the evidence in a neutral light and set aside the finding only if the finding is so contrary to the overwhelming weight of the evidence such that the finding is clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).[7] We review conclusions of law de novo. *See Rich v. Olah*, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.).

The trial court found these facts relevant to this issue:

8. The Court finds that between October 2015 and February 2017, Ms. Scharbauer entered several loan agreements with Clarke Barcus and 440 Equipment. The loan agreements involved substantial sums of money. Clarke Barcus admitted at trial that both he and 440 Equipment accepted the money, that the payments they accepted were loans, and that they were required to repay Ms. Scharbauer.

9. The Court finds that 440 Equipment borrowed a total of $350,000 and Clarke Barcus borrowed a total of $465,000. The loan transactions occurred as follows:

---

[7] Appellants include the factual sufficiency standard in their recitation of appellate review standards. But nowhere in their brief do they argue any finding is so contrary to the overwhelming weight of the evidence such that the finding is clearly wrong and unjust.

| Date | | Amount | | Borrower |
|---|---|---|---|---|
| 10/14/2015 | | $200,000.00 | | Clarke |
| 1/29/2016 | | $50,000.00 | | Clarke |
| 2/5/2016 | | $100,000.00 | | 440 |
| 11/22/2016 | | $200,00.00 | | Clarke |
| 1/27/2017 | | $15,000.00 | | Clarke |
| 1/31/2017 | | $50,000.00 | | 440 |
| 2/20/2017 | | $200,000.00 | | 440 |

10. The Court finds that between October 2015 and February (sic) 2017, 440 Equipment made $100,000 in principal repayments and Clarke Barcus made $4,000 in principal repayments as follows:

| Date | | Amount | | Borrower |
|---|---|---|---|---|
| 8/24/2016 | | $100,000.00 | | 440 |
| 5/4/2017 | | $1,000.00 | | Clarke |
| 5/10/2017 | | $1,000.00 | | Clarke |
| 5/18/2017 | | $1,000.00 | | Clarke |
| 5/25/2017 | | $1,000.00 | | Clarke |

11. The Court finds that based on the evidence presented, and the admissions of Clarke Barcus, the Court finds that he borrowed $465,000 from Ms. Scharbauer and paid back just $4,000. He therefore owes Ms. Scharbauer $461,000 of principal plus applicable interest, as explained below.

12. The Court finds that based on the evidence presented, and the admissions of 440 Equipment, the Court finds that it borrowed $350,000 from Ms. Scharbauer and paid back just $100,000. It

16

therefore owes Ms. Scharbauer $250,000 of principal plus applicable interest, as explained below.

We detailed above Clarke's testimony at trial in which he admitted the transactions were loans, the outstanding balances of the loans, and his and 440 Equipment's failure to repay the loans. Further, Sarah and Clarke's communications specifically acknowledged Sarah performed by lending the money, the amounts of the loans each time they were made, the balances owed, Clarke's offer to pay interest on the loans, Clarke's payment of interest on some of the amounts he repaid, and how 440 Equipment repaid one of its loans before borrowing twice more. There is in fact no dispute about the amounts and dates of the loan transactions as detailed by the trial court in its factual findings, nor how much Clarke and 440 Equipment owe Sarah, as we quoted appellants' admission of these facts above. Clarke even admitted falsely answering an interrogatory when he denied owing any more than $15,000.

There are, nonetheless, factual inconsistencies adverse to the judgment. For example, Clarke's first loan request was for $100,000 at 12% interest, but Sarah advanced to him $200,000 which Clarke accepted and deposited into his personal bank account. Appellants argue that Sarah failed to prove the $200,000 was a loan when Clarke request only $100,000. But in their brief, appellants concede, "Yes, Clarke has testified that the $200,000 check was a loan and that he has to pay it back." Also, Sarah noted "Personal Loan" on some checks to Clarke, but

"Contribution" and "Capital" on checks to 440 Equipment. And some statements in the parties' communications indicate the parties discussed Sarah acquiring (or converting her debt to) some form of equity. But Sarah never acquired equity in Clarke's entities, 440 Equipment treated her funds as loans, and in their communications both Sarah and Clarke characterized her advances as loans. Most importantly, Clarke and 440 Equipment's conduct treated Sarah's advances as loans because they made some repayments which included Clarke's calculations of, and payment of, some interest. And Clarke admitted at trial the funds advanced by Sarah were loans he and 440 Equipment owed to Sarah. All of these discrepancies were reasonably resolved by the trial court as factfinder in favor of its decision. So, more than a mere scintilla of evidence supports the trial court's findings that Sarah's advances were loans that Clarke and 440 Equipment agreed to repay, thereby disposing of appellants' legal sufficiency challenge.[8]

### *Sufficiency of Sarah's Evidence of Demand Loans and Breach*

Appellants further argue that even if the transactions were loans, the evidence is insufficient to support the trial court's determination that the loans were demand loans and, therefore, there is no evidence of Clarke and 440 Equipment's breach. Appellants subtitle their argument, "Sarah chose to give money to Clarke that he did

---

[8] Although the standard for a factual insufficiency challenge is mentioned, appellants' brief includes no argument regarding factually insufficiency. Nevertheless, because Clarke admitted these facts, this evidence overwhelmingly supports the trial court's decision that the transactions were loans, and the parties agreed upon the balances owed.

not have to repay on demand[.]" Their thesis statement is, "Clarke owes Sarah a lot of money and he has to pay it back. But that does not mean that he is legally obligated to pay it back whenever she demands." Appellants argue Sarah was either negligent in failing to hire counsel to properly document the loans or intentionally chose to provide money to Clarke and 440 Equipment that she could not demand they repay. They assert, "[Sarah] has cited no law, no case, no principle of justice that would create the demand loans that she chose not to create herself." Additionally, elsewhere in their brief appellants appear to challenge the adequacy of Sarah's pleading the loans were demand loans. So, we start with Sarah's allegations, review the trial court's findings, then analyze the law regarding loans that do not specify a due date, and conclude the loans were demand loans which Clarke and 440 Equipment breached by not paying on demand.

In her third amended petition, Sarah pleaded,

45. On June 12, 2017, Ms. Scharbauer formally demanded that Clarke remit the unpaid balance of his loans by June 19, 2017. The various notes documenting Ms. Scharbauer's loans to Clarke included no formal due date. Clarke's debts are therefore due on demand. *See* Tex. Bus. & Com. Code § 3.108(a)(2).

. . .

56. Under the terms of the agreements, Clarke was obligated to repay the loans on demand but has failed to do so.

57. Clarke's failure to repay the loans amounts to a breach of the parties' various agreements.

19

(Footnote omitted). We have reviewed the fair notice pleading standards above based on which we construe pleadings in favor of the pleading party when there is no special exception. Sarah's allegations give fair notice she admits the loans do not have due dates and her contention that by operation of Texas law they were demand loans.

The trial court made factual finding 18 regarded the demand nature of the loans:

> 18. The Court finds that the parties' loan agreements include no express due date. Nor did the parties agree upon a payment plan before Clarke Barcus accepted funds from Ms. Scharbauer for himself and 440 Equipment. The Court finds that all of the above-listed loans were demand loans.

In its conclusions of law, the trial court explained its reasons for concluding the loans were demand loans and were breached. The trial court began with the citation in Sarah's pleading and explained with additional authorities the law implying a loan is due on demand.

> 12. The Court concludes that Texas law provides that "[a] promise or order is 'payable on demand' if it does not state any time of payment." Tex. Bus. & Com. Code § 3.108(a)(2). "When an instrument specifies no day of payment it is payable on demand and is construed as containing equivalent words on its face." *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 591 (Tex. App.—Houston [14th Dist.] 2000, no pet). This rule also extends to oral agreements. *See Vela v. Vela*, 14-12-00822-CV, 2013 WL 6700270, at *5 (Tex. App.—Houston [14th Dist.] Sept. 24, 2013, no pet.) (affirming that "there is no reason to require oral contracts to be more specific than written ones" (quoting *Jackson v. Carlson*, 03-08-00429-CV, 2009 WL 638848, at *2 (Tex. App.—Austin Mar. 12, 2009, no pet.))).

20

13. The Court concludes that it does not matter that there is no written agreement classifying the loans as "demand notes." The absence of an agreed maturity date makes the loans due on demand. *Manandhar v. Jamshed*, 02-1 1-00027-CV, 2011 WL 3835980, at *3 (Tex. App.— Fort Worth Aug. 31, 2011, no pet.) ("Appellant emphasizes that appellee's note 'did not have a payable on demand clause.' But if no time for payment of a debt is stated in a note, it is a demand note."). The Court therefore concludes that each of the loans to Clarke Barcus and 440 Equipment are demand loans.

14. The Court concludes that to the extent the law requires a reasonable demand, the Court has found that Ms. Scharbauer's demand was reasonable.[9]

15. The Court concludes that the loans therefore became due on June 19, 2017, the date identified in Ms. Scharbauer's June 12, 2017 demand.

16. The Court concludes that the Clarke Barcus's and 440 Equipment's failure to repay the loans by June 19, 2017 comprises a breach of contract.

In its conclusions of law, the trial court relied on *Jackson* and *Vela*. In *Jackson*, James Jackson wrote a $5,000 check to Thomas Carlson noting in the memo line their agreement that it was a "loan." After Jackson prevailed on summary judgment, Carlson appealed contending that because the loan was only evidenced by the single check there was a failure to prove a due date for repayment. *Jackson*,

---

[9] The trial court announced its decision that factual findings in conclusions of law were the court's factual findings and vice versa:

> The Court recognizes that some of these issues reflect mixed questions of law and fact. Any finding of fact that is actually a conclusion of law, or of which any part thereof is a conclusion of law, shall be considered as such. Any conclusion of law that is actually a finding of fact, or which any part thereof is a finding of fact, shall be considered as such.

21

2009 WL 638848, at \*2. In affirming the summary judgment, the Austin court of appeals reasoned that a loan without a due date is a demand loan, stating:

> If no due date is specified in a written promissory note, payment is due on demand and demand may be made within a reasonable time. *See* Tex. Bus. & Com. Code Ann. § 3.108 (West 2002) (where no due date specified on negotiable instrument it is due on demand); *Gabriel v. Alhabbal*, 618 S.W.2d 894, 897 (Tex. App. —Houston [1st Dist.] 1981, writ ref'd n.r.e.) (demand must be made within reasonable time); *Crenshaw v. Stallings*, 222 S.W. 653, 654 (Tex. Civ. App. —Amarillo 1920, writ dism'd w.o.j.) (stating the general rule that "a promissory note, in which no time is specified for payment, is due upon demand"). Furthermore, courts regularly enforce contracts where no time for performance is specified by implying a reasonable time requirement. *See Hewlett-Packard Co. v. Benchmark Elecs., Inc.*, 142 S.W.3d 554, 563 (Tex. App. —Houston [14th Dist.] 2004, pet. denied) (holding that where no payment due date was specified in sales contract, payment was due within reasonable time); *HECI Exploration Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 634 (Tex. App. —Austin 1992, writ denied) (when no specific time for performance is stated in contract, law will imply reasonable time); *see also Snyder v. Eanes Indep. Sch. Dist.*, 860 S.W.2d 692, 697 (Tex. App. —Austin 1993, writ denied) ("It is conclusively presumed that the parties to a contract knew the law and contracted with reference to it."). We see no reason to require oral contracts to be more specific than written ones. Therefore, we hold that Carlson's affidavit evidence was sufficient to prove a loan due on demand.

*Id*.

In *Vela*, Theresa Vela wrote three checks to Sammy Vela totaling $110,000. Sammy failed to repay the money when Theresa demanded he do so. Theresa sued Sammy and prevailed on summary judgment. On restricted appeal, one of Sammy's arguments was that the oral agreement to repay had no due date. The court of appeals

22

disagreed, followed *Jackson*, reasoned that a loan without a due date was payable on demand, and affirmed the judgment.

We agree with the courts in *Jackson* and *Vela* and the trial court's reasoning here. Sarah pleaded and proved her advances of money to Clarke and 440 Equipment were loans without due dates. Therefore, they are demand loans. Sarah made demand but Clarke and 440 Equipment did not repay the loans. We conclude Sarah adequately pleaded and proved the loans were demand loans that Clarke and 440 Equipment breached by not repaying the loans as demanded. We find no basis to reverse the trial court's judgment against Clarke and 440 Equipment for their breach of the loan agreements.

### *Alter Ego Pleading and Proof*

Finally in their second issue, appellants challenge the alter ego liability in the judgment on the basis that Sarah failed to plead or prove alter ego. The judgment provided, "Defendants Clarke Barcus, 440 Equipment and C-2-It are jointly and severally responsible for the above-described breach of contract damages in the aggregate amount of $917,651.03" (the amount of the aggregate loan debt together with prejudgment interest). We first examine Sarah's pleading, then her evidence.

One year before trial and without special exceptions which would have afforded Sarah the opportunity to clarify her pleading, Sarah alleged in her third amended petition:

23

66. At all relevant times, Clarke, C-2-It, and 440 Equipment acted as alter egos of one another, and they are jointly and severally liable.

. . .

76. At all relevant times, Clarke and 440 Equipment acted as alter egos of one another, and they are jointly and severally liable.

Those allegations were made in the counts for breach of contract regarding the loans to Clarke and those to 440 Equipment, respectively.

Appellants complain on appeal Sarah failed to "allege fraud in any of her breach of contract claims." Additionally, appellants assert Sarah failed to discuss alter ego, veil piercing, or reverse veil piercing in her post trial brief, so "she never explained how her breach of contract claims might be related to fraud, veil piercing, or reverse veil piercing." *Id*. Appellants rely on *Renate Nixdorf GmbH & Co. KG v. TRA Midland Properties., LLC*, No. 05-17-00577-CV, 2019 WL 92038, at *5 (Tex. App.—Dallas Jan. 3, 2019, pet. dism'd) (mem. op.) for the general propositions regarding alter ego and reverse alter ego (the trial court found both here) requiring proof of actual fraud:

> Most often, a trial court disregards a corporate fiction to hold individuals liable for the debts of the corporation, but Texas courts also apply the doctrine in reverse to allow a corporation's assets to "be held accountable to satisfy the liabilities of individuals who treated the corporation as their alter-ego." *Clement v. Blackwood*, No. 11-16-00087-CV, 2018 WL 826856, *5–6 (Tex. App.—Eastland Feb. 8, 2018, pet. denied) (mem. op.); *Wilson*, 305 S.W.3d at 70–71; *Boyo v. Boyo*, 196 S.W.3d 409, 419 (Tex. App.—Beaumont 2006, no pet) (recognizing courts will reverse pierce to hold corporations liable for debts of controlling shareholders who have used corporations to hide assets). In a reverse piercing case, the goal is to treat the shareholders

24

and the corporation as one and the same rather than disregard the corporate fiction to hold shareholders accountable. *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 481–82 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (quoting *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243–44 (5th Cir. 1990) (concluding Texas law would allow a creditor to reach a corporation's assets when there is a showing of an alter ego relationship between the individual debtor and the corporation)).

To pierce the corporate veil and impose liability under an alter ego theory, a plaintiff must show (1) the persons or entities on whom it seeks to impose liability are alter egos of the debtor; and (2) the corporate fiction was used for an illegitimate purpose, satisfying the requirement of section 21.223 of the Texas Business Organizations Code. *Tryco Enterprises, Inc.*, 390 S.W.3d at 508. Section 21.223 requires the plaintiff to show (1) actual fraud and (2) that the fraud was perpetrated primarily for the direct personal benefit of the corporation's shareholder, beneficial owner, subscriber, or affiliate. *See* Bus. Orgs. § 21.223(b); *Tryco Enterprises, Inc.*, 390 S.W.3d at 508; *Ocram, Inc. v. Bartosh*, No. 01-11-00793-CV, 2012 WL 4740859, at *3 (Tex. App.—Houston [1st Dist.] Oct. 4, 2012, no pet.) (mem. op.).

*Id.*

We previously explained that a pleading is sufficient if it gives fair notice to the opposing parties sufficient to enable them to prepare a defense. *Auld*, 34 S.W.3d at 897. And when, as here, there were no special exceptions challenging the allegation, "we liberally construe the pleadings in the pleader's favor." *Bos*, 556 S.W.3d at 305–06. Further, we follow "Constitutional imperatives" in striving to decide cases on their merits rather than unimportant procedural defects. *Marino*, 355 S.W.3d at 634. Keeping these precepts in mind, we consider whether appellants had fair notice that Sarah sought to hold Clarke, C-2-It, and 440 Equipment jointly

25

and severally liable on the basis that they were alter egos. Paragraphs 66 and 76 informed appellants of exactly that. Although appellants complain Sarah did not explain further the underlying basis for her claim in her pleading nor in her post trial brief, the record reflects appellants did not file special exceptions to obtain a more specific pleading nor did they complain Sarah failed to fully and completely answer any discovery they directed to her about her alter ego theory. So, after being on fair notice of Sarah's alter ego theory for a year before trial, appellants either satisfied their need for further information through discovery that is not in the record before us, or failed to obtain such further information by at least two means at their disposal: special exceptions and discovery. On this record, we find no merit in appellants' complaint about Sarah's pleading of alter ego.

Appellants also challenge the sufficiency of the evidence supporting the trial court's decision Clarke used C-2-It and 440 Equipment to perpetrate an actual fraud on Sarah. Appellants' entire argument is a single paragraph:

> Accordingly, Sarah did not present evidence that her breach of contract claims had anything to do with fraud. Because Sarah failed to show evidence of actual fraud in support of breach of contract claims, she did not prove facts that would warrant veil piercing or reverse veil piercing under an alter ego theory. *See Renate Nixdorf GmbH & Co.KG,,* [sic] 2019 WL 92038, at *5 (requiring proof of actual fraud for veil piercing or reverse veil piercing under an alter-ego theory). The trial court's findings of fact and conclusions of law to the contrary, particularly findings 42-48 and conclusions of law 18-21 and 46, cannot be sustained.

26

We first analyze Sarah's challenge to appellants' argument in their brief, then we analyze the merits of their argument.

Sarah asserts appellants have not challenged the sufficiency of the evidence of fraud related to the trial court's contractual alter ego determination. While we acknowledge appellants' discussion comprises only one paragraph and is not indexed in their table of contents, we disagree. Appellants assert the complete absence of any evidence of fraud supporting the alter ego finding, citing one authority, *Renate Nixdorf*, and challenging findings of fact 42-48 and conclusions of law18-21 and 46, although they do not make further, detailed arguments about the nuances of any evidence. This does not constitute briefing waiver. *See City of Arlington v. State Farm Lloyds*, 145 S.W.3d 165, 167–68 (Tex. 2004) ("Nor do we agree that the City's citations to the 'entire record' waived its no-evidence issues," but when challenging the strength of evidence supporting a verdict as no more than surmise or suspicion, party must "detail the relevant parts of the record."). However, we cannot make further detailed arguments about the nuances of evidence for appellants because in our adversarial system, we follow the party presentation rule:

> In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a pro se litigant's rights. *See Castro v. United States*, 540 U.S. 375, 381–383, 124 S. Ct. 786, 157 L.Ed.2d 778 (2003). But as a general

27

rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Id.*, at 386, 124 S. Ct. 786 (Scalia, J., concurring in part and concurring in judgment).

*Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) (footnotes omitted); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In short: '[C]ourts are essentially passive instruments of government.' . . . They 'do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties.'") (changes by U.S. Supreme Court) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc)). Accordingly, Sarah has a constitutionally justifiable expectation that we will not assist appellants with their brief or arguments (just as appellants have the same expectation with respect to our obligation to refrain from helping Sarah). *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 248 (1980) (due process in Fifth Amendment to United States Constitution guarantees an "impartial and disinterested tribunal in both civil and criminal cases"); *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi 1993, no pet.) (due process clause in article I, §§ 13 and 19 of the Texas Constitution requires judges to be neutral and detached); *Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (judge should not act as advocate nor adversary for any party); *see also* TEX. CODE JUD. CONDUCT, Canon 2A, reprinted in TEX. GOV'T CODE, tit. 2, subtit. G app.

28

C ("A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.").  For these reasons, to resolve appellants' contractual alter ego argument, we must search the appellate record for the *complete absence* of evidence Clarke and his entities fraudulently used the entity fictions of 440 Equipment and C-2-It.  *See* TEX. BUS. ORGS. CODE § 21.223(b); *Renate Nixdorf*, 2019 WL 92038, at *5; *Tryco Enters.*, 390 S.W.3d at 508.

We agree with the premise of appellants' argument that in *Renate Nixdorf* a different panel of this Court relied on *Tryco Enterprises* for the conclusion that a party must prove more than a traditional alter ego theory; "a party must also show that the corporate form was used to perpetrate a fraud under article 2.21, now Business Organizations Code section 21.223." *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 n.4 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) (citing *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008)).[10]

---

[10] Section 21.223(b) provides that the bar to recovery for "alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory" provided for in subsection (a)(2) does not apply "if the oblige demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate."  TEX. BUS. ORGS. CODE § 21.223(b).

Our review of the evidence is guided by the trial court's relevant findings of fact, even though appellants only challenged 42-48.[11]

38. The court finds that on numerous occasions (including when soliciting the loans), Clarke Barcus represented that customers owed 440 Equipment and his other businesses substantial sums and that Ms. Scharbauer's money would safely rest in 440 Equipment's account:

> • October 14, 2015: "My customers owe me about $150,000?" [Ex. 45].
>
> • January 25, 2016: "Our intention will be to leave your money in cash (checking account)?" [Ex. 37].
>
> • January 31, 2017: "C-2-It has $350,000 due to come in from customers and an insurance claim that should have paid months ago . . . $200k could come in between now and February 15." [Ex. 29].

39. The court finds that as late as May 4, 2017, Clarke Barcus continued to represent that he and 440 Equipment could soon begin substantial repayments: [Ex. 66].

> I am waiting on nearly $200k from past due sources, still: insurance money, customers that are behind on paying etc. This is not all the money I am due. There is another $150k that is current.

40. The court finds that Clarke Barcus provided these repeated assurances during a time when he and Sarah considered one another close friends, and Clarke admitted on cross-examination that Sarah had every reason to trust his representations and rely on the statements he made while soliciting the loans." [Testimony of Clarke Barcus].

41. The court finds that Clarke and Cyrus Barcus are the sole owners of 440 Equipment and C-2-It.

---

[11] *See Shaw*, 251 S.W.3d at 169 (where appellate court can fairly determine from the argument which specific finding of fact the appellant challenges, failure to specify which factual finding is challenged is not fatal).

42. The court finds that Clarke Barcus has total control of both companies' financials, and he uses company funds to satisfy both personal and business obligations as he wishes.

43. The court finds that Clarke Barcus makes no meaningful distinction between his own property and that of 440 Equipment or C-2-It. He intermingled loan funds without any documentation of supporting lawful business transactions.

44. The court finds that after the August 2016 art sale, Cyrus Barcus transferred the proceeds of the sale to 440 Equipment. Clarke Barcus withdrew some of the money 440 Equipment received from Cyrus Barcus and used it to meet various of his own personal obligations, including the August 2016 interest payment made on his personal loans from Ms. Scharbauer. In January and February 2017, Clarke Barcus also solicited loans on behalf of 440 Equipment based on his representation that C-2-It had sufficient accounts receivable to justify the loans.

45. The court finds that no distinction between Clarke Barcus, 440 Equipment, and C-2-It. 440 Equipment, C-2-It, and Clarke Barcus are one another's alter ego.

46. The court finds that Clarke Barcus repeatedly misled Ms. Scharbauer about the intended use of the loans, his actual use of the loan funds, and his intent to repay her. He withdrew money loaned to 440 and used it to pay Ms. Scharbauer a portion of a different loan. He also attempted to persuade Ms. Scharbauer to loan additional money to 440 that he explicitly stated he would use to repay his personal loans to her.

47. The court finds that in soliciting loans for himself and 440, Clarke Barcus repeatedly referred to amounts owed to C-2-It, and payments he expected C-2-It to receive in short order, which he said he would use to pay her back and/or begin a repayment plan. Those misrepresentations induced Plaintiff to lend him more money. Clarke Barcus's use of C-2-It underscores the fraudulent scheme that he set up to create the false impression that Ms. Scharbauer was lending to legitimate businesses.

48. The court finds that Clarke Barcus used the corporate form of 440 Equipment and C-2-It to facilitate a fraudulent scheme to

31

misappropriate substantial sums from Ms. Scharbauer for his personal use.

(Footnote record citations in brackets). The trial court explained its reasoning in the following conclusions of law, each of which appellants challenged.

18. Clarke Barcus made no distinction between himself, 440 Equipment, and C-2-It. The Court concludes that 440 Equipment, C-2-It, and Clarke Barcus are one another's alter ego.

19. The Court concludes that that Clarke Barcus used the corporate form of 440 Equipment and C-2-It to facilitate his fraudulent scheme to misappropriate substantial sums from Ms. Scharbauer for his personal use.

20. The Court concludes that because of the use of 440 Equipment and C-2-It to perpetuate an actual fraud, veil-piercing and reverse veil-piercing are appropriate.

21. Accordingly, the Court concludes that Defendants Clarke Barcus, 440 Equipment, and C-2-It are jointly and severally responsible for the breach of contract damages described above.

. . .

46. For the foregoing reasons, the Court concludes as follows:

• Clarke Barcus is liable to Ms. Scharbauer for breach of contract in the amount of $609,842.81, as of June 10, 2019, and interest continues to accrue;

• 440 Equipment is liable to Ms. Scharbauer for breach of contract in the amount of $307,808.22, as of June 10, 2019, and interest continues to accrue;

• Defendants Clarke Barcus, 440 Equipment, and C-2-It are jointly and severally responsible to Plaintiff Sarah Scharbauer for the above-described breaches of contract in the aggregate amount of $917,651.03[.]

Appellants do not challenge findings of fact 38-41. Our review of the evidence indicates Clarke made the representations stated in those findings of fact and that he repeated the assertions throughout his relationship with Sarah as found in finding of fact 40, although some statements have additional content and nuances which we do not consider.[12] *See City of Arlington*, 145 S.W.3d at 167–68 (to challenge the strength of evidence supporting a verdict as no more than surmise or suspicion, party must "detail the relevant parts of the record.").

It is undisputed Clarke and Cyrus are the sole owners of 440 Equipment and although the trial court found they both owned C-2-It, Clarke testified he solely owned C-2-It. From that evidence and Clarke's testimony about his sole handling of the financials of both companies and Cyrus' lack of involvement except to supply some funding, the trial court drew a fair inference in finding of fact 42 that Clarke had total control of both 440 Equipment's and C-2-It's financials. The evidence supports finding of fact 43–45 because Clarke testified, consistent with the documents, that he borrowed money personally and caused 440 Equipment to borrow money, then took the proceeds of the art sale which Sarah paid to Clarke and Cyrus personally and put the money into the business accounts with which Clarke caused 440 Equipment to repay $100,000 of its debt to Sarah.

---

[12] Clarke's complete statement mentioned in finding 38 is this bullet point: "[O]ur intention will be to leave your money in cash (checking account) and supplement it with additional funds after our tax returns are finalized *but we will use the money as we see best fit for the company's prospects*[.]"

In finding of fact 46, the trial court drew inferences from the facts it found in 38–45 to find Clarke misled Sarah about the purposes of the loans, the actual use of the loan funds, and his intent to repay Sarah. Appellants do not challenge the reasonableness of this finding, just that there is no evidence to support it, and we have reviewed the evidence above that supports it.

Finding of fact 47 pertains to C-2-It's involvement as an alter ego. In numerous communications, Clarke represented C-2-It's expected revenue as available to 440 Equipment and Clarke for repayment of the debts to Sarah, and that he would use C-2-It's revenue to repay the loans all with no mention of the separate entity status of C-2-It. Clarke proposed a check swap by which Sarah would loan to his entities the amount of money Clarke owed Sarah with which Clarke would then repay Sarah to move his debt into the entities. The representations, proposals, and handling of the loan funds is some evidence that supports the trial court's finding that this evidence was part of the fraudulent scheme to make it appear to Sarah that C-2-It's revenue enhanced the creditworthiness of 440 Equipment as a basis for her to loan 440 equipment $250,000 in January and February of 2017.

Finally, the trial court's summary finding of fact 48 and its conclusions of law 18–21 are its decisions based on the evidence of fraud reviewed above are only challenged for no evidence of the use of the entity forms as part of a fraud. We have reviewed the record and determined there is some evidence supporting the trial

34

court's factual findings and conclusions of law that Clarke, 440 Equipment, and C-2-It used the entity forms as part of an actual fraud on Sarah.

In summary regarding appellants' first two issues, the trial court found Sarah pleaded and proved she loaned Clarke and 440 Equipment $461,000 and $250,000, respectively, in return for their promise to repay with interest (not challenged on appeal), with no agreed date the loans were due. The trial court relied on Texas law to find the loans were demand loans, Sarah made demand through counsel, Clarke and 440 Equipment did not pay the loans when demanded, and Clarke, 440 Equipment, and C-2-It were alter egos of one another in the loan transactions. Having reviewed and rejected appellants' arguments in their first and second issues, we find no basis to reverse the judgment as to the loans.

## B. Third Issue: Appellants' Counterclaims

In their third issue, appellants challenge the trial court's adverse rulings on their counterclaims.

### *Breach of Contract*

Appellants first contend Sarah breached an agreement to further negotiate the terms of the loan agreements. Sarah responds by asserting the negotiation language in the November 22, 2016 was merely an unenforceable agreement to agree in the

future,[13] but if it was binding then Sarah complied with it and Clarke is the one who failed to participate in any way to negotiate more detailed terms of an agreement once he had Sarah's money.

Appellants cite various arguments Sarah made in a summary judgment motion, but the trial court did not grant summary judgment against appellants' counterclaim Sarah breached a contract.[14] Appellants' only other reference in their argument is to the November 22, 2016 agreement which contained the provision,

[13] *See Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 371 (Tex. 2019):

> We have held, however, that agreements to negotiate toward a future contract are not legally enforceable. *See Fisher*, 479 S.W.3d at 242 ("To be sure, contracting parties' 'agreement to enter into negotiations, and agree upon the terms of a contract, if they can, cannot be made the basis of a cause of action.'") (quoting *Radford v. McNeny*, 129 Tex. 568, 104 S.W.2d 472, 474 (1937)). And Texas courts of appeals have held that this is true even if the party agreed to negotiate in good faith. *See, e.g., Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 139 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied) ("Regardless of whether a duty of good faith and fair dealing arose under the parties' agreement, Whataburger is not obligated to execute new contracts with Barrand."); *John Wood Group*, 26 S.W.3d at 21 ("By contrast, under Texas law, an agreement to negotiate in the future is unenforceable, even if the agreement calls for a 'good faith effort' in the negotiations."); *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 104 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("The fact that this particular agreement to negotiate in the future includes a term calling for the appellees to put forth a 'good faith effort' in the negotiations does not remove the agreement from this rule. The agreement, whatever its specific language, is still an agreement to enter into future negotiations, and, as such, it is unenforceable.").

[14] Sarah's motion for summary judgment separately addressed (1) appellants' claim that Sarah breached the November 2016 agreement by failing to negotiate terms of the loan agreement, and (2) appellants' claim for unfair debt collection. The two paragraphs granting relief in the trial court's October 7, 2018 Order on Plaintiff's Motion for Summary Judgment clearly state summary judgment was exclusively granted on the unfair debt collection counterclaim:

> The Motion is GRANTED with respect to Count II of Defendants' Original Answer, Counterclaim, and Request for Disclosures, that Ms. Scharbauer violated the Texas Debt Collection Practices Act ("Count II"). IT IS THEREFORE ORDERED that Count II is hereby dismissed with prejudice.

> The Motion is DENIED in all other respects.

"We both agree to discuss more details, whatever the details are, at another time + date, but w/in the 2017 calendar year." Therefore, for the same reasons we stated above regarding appellants' challenge to the sufficiency of the evidence of fraud supporting alter ego, we construe appellants' brief to globally challenge the complete absence in the trial record of any evidence of Sarah's effort to negotiate more detailed terms of their loan agreements. *See City of Arlington*, 145 S.W.3d at 167–68.

Clarke testified he admitted that after the November 22, 2016 agreement, Sarah asked him on multiple occasions: to agree to a payment schedule; to use a third party to help negotiate the terms including Clarke's father, Cyrus, and Sarah's mother; and for the name and contact information of Clarke's lawyer who would negotiate or draft the terms. Sarah's counsel reviewed with Clarke numerous communications initiated by Sarah in which she urged discussion of these matters. Clarke admitted he never provided a lawyer's name or contact information, never agreed to a third party to help negotiate including never agreeing for Cyrus to help negotiate terms, never proposed specific payment terms, never proposed a specific maturity date (except he did propose there be no maturity date), never proposed any specific interest schedule, and then wrote Sarah two emails stating he did not want to communicate with Sarah except through professionals or lawyers. It was at that point Sarah hired counsel who made demand for payment and filed suit. In his trial

testimony, Clarke primarily complained Sarah breached the agreement to negotiate terms because she never proposed a specific maturity date or specific repayment terms, or hired counsel to do so, before he terminated direct discussions with Sarah.

Even if we consider Clarke's complaints in his trial testimony as supplementing appellants' brief, Clarke's fault-finding with Sarah's efforts to negotiate cannot overcome his admission of Sarah's efforts to negotiate further terms of their agreements. Sarah's admitted efforts constitute some evidence (and it is substantial evidence) supporting the trial court's judgment—as the reasonable fact-finder—that Sarah performed any obligation she had to further negotiate terms of the loans. Accordingly, we reject appellants' challenge to the trial court's judgment that appellants take nothing on their breach of contract counterclaim against Sarah.

### *Violation of the Texas Debt Collection Act*

Appellants also contend the trial court erred in granting summary judgment against Clarke's counterclaim for unfair debt collection violating the Texas Debt Collection Act. Sarah moved for no-evidence summary judgment against the unfair debt collection counterclaim on three grounds: that there is (1) no evidence Clarke's debts are consumer debts, (2) no-evidence Sarah engaged in a prohibited activity, and (3) no-evidence Clarke suffered any damages from any alleged unfair debt collection violation.

We review de novo a trial court's grant of a motion for summary judgment. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012). We must affirm a summary judgment when a trial court does not specify the grounds for its ruling, if any of the grounds in the motion are meritorious. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). To avoid a no-evidence summary judgment, the nonmovant has the burden to produce summary judgment evidence raising a genuine issue of material fact as to each challenged element of its cause of action; which evidence we consider in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not. *Id.*

The record on which the trial court makes its summary judgment decision and on which we review the summary judgment is created by the movant and non-movant filing the evidence on which they rely as attachments to their respective motion or response, or by reference to appendices they file. *See* TEX. R. CIV. P. 166a(a) (attachment by movant), (b) (attachment by non-movant), (d) (appendices filed and referred to by either movant or non-movant). Unless the appellate record clearly indicates the trial court considered evidence outside the summary judgment record, we will not consider evidence elsewhere in the trial court's file, such as a response to a different motion for summary judgment or evidence supporting a motion for new trial. *See Saenz v. S. Union Gas Co.*, 999 S.W.2d 490, 494 (Tex.

39

App.—El Paso 1999, pet. denied) (when no request for trial court to take judicial notice of evidence attached to response to previous motion for summary judgment, that evidence was not considered by trial or appellate courts); *Wai Ling Lee v. Palacios*, No. 14-06-00428-CV, 2007 WL 2990277, at *2 (Tex. App.—Houston [14th Dist.] Oct. 11, 2007, pet. denied) (mem. op.) (evidence attached to non-movant's motion for new trial filed after summary judgment granted not considered by trial or appellate courts).

**Consumer Debt — § 392.001(2)**. Appellants argue Sarah conceded in her motion for summary judgment that her loan for Clarke's Super Bowl trip was consumer debt. *See* TEX. FIN. CODE § 392.001(2) ("'Consumer debt' means an obligation, or an alleged obligation, primarily for personal, family, or household purposes and arising from a transaction or alleged transaction."). More precisely, Sarah limited her § 392.001(2) ground for no-evidence summary judgment to the other loans when she excluded the Super Bowl loan by such statements as, "There is no evidence that any of Clarke's debts, aside from the Super Bowl Loan, are consumer debts." On the other hand, in appellants' brief, Clarke points to no evidence in the summary judgment record that the other loans were consumer debts. In her brief, Sarah points to the summary judgment record where Clarke testified he did not remember what use he made of the proceeds of the other loans and asserts that is insufficient summary judgment evidence that any of them were consumer

40

debts. We agree this is not evidence the other loans were consumer debts. So, the trial court did not err in granting summary judgment as to the other loans.

**Unlawful Threat — § 392.301**. Appellants argue in their brief that Sarah through her accountant made threats that ranged from filing lawsuits to inflicting violence on Clarke. Appellants rely on § 392.301(a)(1) of the finance code which provides in relevant part:

> (a) In debt collection, a debt collector may not use threats, coercion, or attempts to coerce that employ any of the following practices:
>
>> (1) using or threatening to use violence or other criminal means to cause harm to a person or property of a person;
>>
>> . . .
>
> (b) Subsection (a) does not prevent a debt collector from:
>
>> (2) threatening to institute civil lawsuits or other judicial proceedings to collect a consumer debt . . . .

TEX. FIN. CODE § 392.301(a)(1), (b)(2).

Appellants direct us to the evidence of a threat which Clarke brought forward in opposition to Sarah's motion for summary judgment: Clarke's deposition testimony that Sarah's accountant called him and asked him to agree to terms of the loan that were not included in the original agreement—repayment terms. Clarke responded it was outside Sarah's legal rights to insist on additional, new terms.

Clarke testified the accountant then stated, "We can do this the easy way or the hard way," to which Clarke replied, "I'm done talking with you," and hung up.[15]

When asked in his deposition, which we find in the summary judgment record, whether he thought the accountant meant taking legal action, Clarke responded, "You know, I wish I got him to elaborate. It sounded a lot more severe than that." Asked what Clarke meant by that, he responded, "I don't know. Send the goons. Whatever people in Midland do. I'm not sure." Asked again whether the accountant meant filing a lawsuit, Clarke responded, "I have no idea how I can know what [the accountant] is thinking." Pressed further, Clarke explained, "I thought it was a threat, you know, a vague threat. I didn't care to hear the rest; I hung up." He further answered, "It was vague. You know, nobody — I don't know. I just hung up. I didn't want to hear it. I didn't want to hear what the hard way was in his mind." Then he added, "It could have been anything from a civil lawsuit to violence to whatever. The 'hard way,' whatever that is, I didn't want to hear it."

Appellants make no argument and do not cite any opinion that concludes a vague statement, "We can do this the easy way or the hard way," without additional context is an unlawful threat under § 392.301(a)(1), nor have we found any. The statute explicitly authorizes "threatening to institute civil lawsuits"— § 392.301(b)(2) — and other lawful threats not at issue here. *See id*. § 392.301(b)(1),

---

[15] In his deposition, Clarke testified these were the accountant's exact words.

(3). Clarke acknowledged twice the threat was vague and four times he did not know what the accountant meant including, "I have no idea how I can know what [the accountant] is thinking."

Sarah argues Clarke's further testimony that Clarke thought the accountant was threatening violence such as, "Send the goons. Whatever people in Midland do." is self-serving speculation. Sarah relies on *Los Cucos Mexican Cafe, Inc. v. Sanchez,* No. 13-05-578-CV, 2007 WL 1288820, at *2 (Tex. App.—Corpus Christi 2007, no pet.) (mem. op.) ("Self-serving, speculative and conclusory statements of fact or law are insufficient to raise an issue of fact.") (citing *McIntyre v. Ramirez,* 109 S.W.3d 741, 749–50 (Tex. 2003)). We agree Clarke's speculation about what the accountant's vague threat meant is no evidence the accountant's statement is an actionable threat under § 392.301(a)(1). Accordingly, the trial court did not err in granting summary judgment on the basis that the accountant's statement was not an unlawful threat under § 392.301.

**Unlawful Demand for Interest — § 392.303**. Finally, appellants argue in their brief Sarah committed unfair debt collection by demanding interest when the parties had not agreed upon interest. *See* TEX. FIN. CODE § 392.303(a)(2) (debt collector prohibited from "collecting or attempting to collect interest . . . unless the interest . . . is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer"). The only documents in the record to which

43

appellants' brief directs us regarding an attempt by Sarah to collect interest are Sarah's post-trial memorandum and the trial court's findings of fact and conclusions of law. But these were not part of the summary judgment record, so they cannot comprise an evidentiary basis to defeat Sarah's no-evidence summary judgment. *See Saenz*, 999 S.W.2d at 494; *Palacios*, 2007 WL 2990277, at *2.

Appellants' summary judgment response supported the same argument by directing the trial court to Sarah's summary judgment exhibits 22 and 24. Summary judgment exhibit 22 is a chain of three emails between Clarke and Sarah's lawyer, Eric Pinker. None of the emails mention interest or collection of interest. Mr. Pinker's email requests Clarke to cease personal attacks on Sarah, focus on the debt owed, and if Clarke disputes the amount of the debt then demonstrate what Clarke contends is the correct amount of the debt. Summary judgment exhibit 24 is Clarke's answers to interrogatories in which in one answer he restates his contention that Sarah violated § 39.303(a)(2) by demanding repayment that included interest when Clarke contends the agreements did not provide for interest. His answer, however, did not provide evidence Sarah had demanded interest, or that she had demanded interest on the Super Bowl loan in particular (the only loan we found that survived Sarah's § 392.001(2) consumer-debt ground for no-evidence summary judgment). Accordingly, appellants' brief does not direct us to any evidence of an attempt to

collect interest where none was agreed to in violation of § 392.303(a)(2), nor did they direct the trial court to any.

**No Damages**. Appellants did not address in their brief Sarah's ground for summary judgment that there was no-evidence appellants suffered damages as a result of any unfair debt collection.[16]

For all these reasons, we reject appellants' third issue that the trial court erred in granting judgment against their counterclaims.

## C. Fourth Issue: Fraud and Conspiracy in the Artwork Transaction

In their fourth issue, appellants contest the judgment against Clarke for defrauding Sarah in the artwork transaction, and Clarke and Cyrus's conspiracy to achieve this fraud.

### *Artwork Fraud*

Appellants assert Clarke's representations are statements of opinion and so there is legally insufficient evidence of fraud. "Pure expressions of opinion are not representations of material fact, and thus cannot provide basis for fraud claim." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011); *see also Holland v. Thompson*, 338 S.W.3d 586, 596 (Tex. App.—

---

[16] *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970) ("The judgment must stand, since it may have been based on a ground not specifically challenged by the [appellant] and since there was no general assignment that the trial court erred in granting summary judgment.").

.

45

El Paso 2010, pet. denied) ("An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud."). Appellants argue this is particularly true about expressions of opinions about monetary value, citing *McCollum v. P/S Investments, Ltd.*, 764 S.W.2d 252, 254 (Tex. App.—Dallas 1988, writ denied). But in *McCollum*, a different panel of this Court pointed out there is an exception to the general rule "when the person giving the opinion has knowledge superior to that of the person relying upon the opinion, as, for example, when the facts underlying the opinion are not equally available to both parties." *Id.* at 254-55 (citing *Wright v. Carpenter*, 579 S.W.2d 575, 580 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.)). Sarah relies on this to argue Clarke and Cyrus had greater knowledge of the value of the artwork and, therefore, their representations about its value are actionable.

Appellants argue, "Sarah did not actually prove any of these allegations" pertaining to her fraud and conspiracy claims regarding the artwork transaction. Sarah interprets this as arguing legal insufficiency of the evidence. We agree and review the record accordingly.

Appellants do not specify a finding of fact they challenge.[17] The trial court's findings of fact relevant to fraudulent misrepresentation are these:

---

[17] *See Shaw*, 251 S.W.3d at 169 (where appellate court can fairly determine from the argument which specific finding of fact the appellant challenges, failure to specify which factual finding is challenged is not fatal).

19.  The Court finds that in addition to borrowing money from Ms. Scharbauer, Clarke Barcus and his father, Cyrus Barcus, also sold her a set of paintings on August 18, 2016.  Clarke Barcus drafted, and he and his father executed, six "Bills of Sale," setting the sale price for each painting as follows: [Ex. 62] [chart omitted; aggregate of sale prices $355,000]

20.  The Court finds that, prior to the sale, Clarke Barcus represented to Ms. Scharbauer that his father had substantial experience collecting art and knew the marketable value of the paintings with a high degree of certainty.  He also represented that Ms. Scharbauer would be able to sell the paintings at the same or a higher price without difficulty.

21.  The Court finds that Clarke Barcus represented to Ms. Scharbauer that he and his father had current appraisals for the paintings that supported the price listed in the Bills of Sale.

22.  The Court finds that Ms. Scharbauer relied on Clarke Barcus's representations concerning the value of the paintings and the existence of appraisals in purchasing the artwork.

23.  The Court finds that [a]fter Clarke and Cyrus Barcus received Ms. Scharbauer's money, neither relinquished possession of their respective paintings to Ms. Scharbauer.

24.  The Court finds that neither Clarke nor Cyrus Barcus intended to actually sell the paintings.  Rather, the sale was part of a scheme to extract additional monies from Ms. Scharbauer.

The relevant conclusions of law are these:

26.  "Fraudulent inducement is a species of common-law fraud that shares the same basic elements:  (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

. . .

29. Clarke Barcus misrepresented the value of the paintings to Ms. Scharbauer and misrepresented that he and his father had current appraisals that supported the price identified in the Bills of Sale.

. . .

31. Ms. Scharbauer relied on Clarke Barcus's misrepresentations in purchasing the art.

Clarke admitted at trial he suggested the sale of the art. He sent Sarah pictures of numerous pieces of art. Sarah testified at trial she did not want the artwork but engaged in the transaction because she wanted to help out Clarke by lending him more money. Clarke proposed the artwork transaction to provide her with some security that Clarke and Cyrus were operating in good faith. At that time in early August 2016, Clarke owed $250,000 and 440 Equipment owed $100,000 and neither had repaid anything. Sarah had briefly seen but not studied the artwork at Cyrus's house and Clarke sent a picture of his painting that hung in his father-in-law's house. She knew Cyrus supported the local art community and that these paintings were not his entire collection. Sarah considered Cyrus and Clarke knowledgeable about fine art.

Sarah testified, "Before I bought them, I asked Clarke if they were insured and appraised, and Clarke told me yes, and the paperwork for all of Cy's paintings, Cy had. And [the paperwork for] the one for Clarke's was at his step-father's, Paul Hillier, I believe." Sarah and Clarke did not negotiate the price of the artwork and she never claimed she discussed the price with Clarke. According to Sarah, Clarke

simply put the price for each piece of art in individual bills of sale. Sarah testified she understood that the value or the price in the bills of sale matched what was in the appraisals that Clarke had told her existed. She testified:

Q. [by Sarah's attorney] Was it important to you that Mr. Clarke Barcus told you that he and his father had appraisals for the paintings that you purchased?

A. Absolutely.

Q. Would you have bought the paintings if they didn't have appraisals?

A. No.

Q. And when Mr. Clarke Barcus told you that he and his father had appraisals for these six paintings, did you have an understanding of what the appraised value of the paintings was relative to the price that Mr. Barcus put in the bills of sale?

A. They were the same.

Q. So before you purchased the paintings, you believed that Mr. Clarke Barcus and his father had appraisals for each of these paintings in the bills of sale that matched the price that Mr. Barcus put in the bills of sale?

A. I did.

Q. Did you trust Mr. Barcus --

A. A hundred --

Q. -- Clarke Barcus?

A. A hundred percent.

Q. And -- and you didn't come up with the price in the bills of sale, correct?

A. No.

Q. Did you try to negotiate the price?

49

A. No.

Q. Was that -- was that because you understood that the value or the price in the bills of sale matched what was in the appraisals that Mr. Clarke Barcus told you existed?

A. Yes.

Sarah further testified on cross examination:

Q. [by appellants' attorney] You said that Clarke Barcus told you that the -- that he had an appraisal for all of this artwork, correct?

A. Yes.

Q. Okay. And you said that he told you that the appraisal was the same as the price that he was charging you or his father was charging you for the artwork, correct?

A. Yes.

Sarah's final testimony on the subject was on re-direct examination:

Q. [by Sarah's attorney] And did he tell you whether the appraised value in those alleged appraisals supported the prices that you actually paid for the art?

A. He did.

Sarah testified she asked Clarke for copies of the appraisals and insurance before she bought the paintings, but he did not provide them. She admitted, however, she did not insist on Clarke providing the documents before paying for the paintings. Clarke admitted that at the time he set the price for each piece of art he did not possess or have performed separate appraisals for any of the art. He testified he told Sarah he thought the prices in the bills of sale were fair and reasonable. But Clarke knew from talking to Cyrus that Cyrus had previously attempted to sell his

50

artwork with reserve prices set at or substantially below the prices in the bills of sale and Cyrus did not receive even an opening bid for the reserve price on any piece.

Each bill of sale provided Sarah could take possession of the art on twenty-four hours' notice. After filing suit, Sarah's counsel requested possession of the art so Sarah could sell it. Clarke initially rejected Sarah's attempt to take possession of the art stating in an email to one of Sarah's lawyers that if he attempted to enforce Sarah's rights in the bills of sale, "I will take that to mean you are part of the team she has assembled to make me do this the hard way and I will have an attorney seek my full rights and protection under the law." Ultimately, Sarah obtained the paintings from Clarke and Cyrus, stored them professionally for a while, then sold them significantly below what she paid for each piece.

The record supports the trial court's findings of fact that Clarke made a material misrepresentation that he had appraisals valuing the art for the sale prices stated in the bills of sale and, therefore, those prices were the market value of the art. The trial court was entitled to weigh Sarah and Clarke's demeanors including Clarke's interrogatory answer denying he owed Sarah any debt other than the Super Bowl loan which Clarke admitted at trial was a false statement made under oath. The trial court was entitled to believe Sarah's testimony that Clarke made the representations about having appraisals reflecting the amounts in the bills of sale when Clarke knew that was false because he did not have any appraisals. The trial

51

court could believe Sarah's testimony that Clarke represented the prices were market value when Clarke knew Cyrus could not obtain those prices at a previous sale so at a minimum the trial court could conclude Clarke knew he did not know the value of the artwork while asserting the truth of his statement, or worse that his statements were false.

The trial court had sufficient evidence to decide Clarke made the statements with the intention Sarah should act on them by paying for the artwork while leaving it in place. Clarke through his access to Cyrus had knowledge superior to Sarah regarding their paintings and the DFW art market. Clarke admitted Sarah "had every reason to trust [him] during" 2015 through early May, 2017. Sarah testified she did trust Clarke and his representations. The trial court as a reasonable factfinder could conclude Clarke never intended that he or Cyrus would part with their artwork notwithstanding Sarah having paid for it. Nothing about Clarke's statement is an opinion; his statement was a false statement of present fact that he had appraisals for the art which a reasonable factfinder could conclude was a representation the values in the appraisals were fair market values and those were the prices in the bills of sale. *See Italian Cowboy*, 341 S.W.3d at 338. For all these reasons, the trial court had sufficient evidence to find fraud for the artwork transactions.

*Artwork Damages*

Appellants also challenge the finding that Clarke's fraud damaged Sarah or that the proper measure of damages were awarded by the trial court. The trial court's findings about Sarah's damages and the amount of her damages are as follows.

19. [chart showing aggregate sales prices Sarah paid of $355,000]

. . .

25. The Court finds that Ms. Scharbauer took possession of the paintings in June 2017 after filing this lawsuit. She hired Brenda Simonson-Mohle, an art broker with nearly 40 years' experience, to sell the paintings. Ms. Mohle sold four of the paintings through private sales and two through auction. Ms. Mohle sold the paintings using her considerable experience and expertise, and neither Ms. Scharbauer nor her counsel directed the timing or the manner of the sales.

26. The Court finds that through the sales of her artwork, Ms. Scharbauer recovered $104,249.50. As depicted in this chart, this amount includes Ms. Scharbauer's sales and storage costs: [chart omitted].

27. The Court finds that Ms. Mohle conducted a commercially reasonable sale with respect to each painting and that the sales occurred between willing buyers and a willing seller.

28. The Court finds that that the value of each painting as of the date of Ms. Scharbauer's acquisition is the amount Ms. Scharbauer recovered through the commercially reasonable sale of each painting described above. These values should also be considered the fair market value of each painting.

29. The Court finds that Defendants Clarke Barcus and Cyrus Barcus caused Ms. Scharbauer $250,750.50[18] in damages based upon

---

[18] In its findings and conclusions, the trial court calculated that Sarah was entitled to damages of $250,750.50 (findings 29 and 30) for the artwork fraud by subtracting from the amount Sarah paid, $355,000 (finding 19), the amount of Sarah's sales of the artwork net of commissions and expenses, $104,249.50 (finding 26). In the judgment, the trial court awarded $142,112.00 as damages for the artwork

Defendants Clarke Barcus and Cyrus Barcus fraud relating to the sale of the paintings.

30.    In the alternative, sum of $250,750.50 is the amount of consideration Defendants Clarke Barcus and Cyrus Barcus must return to Ms. Scharbauer, in order to restore Ms. Scharbauer to her original position before the sale and purchase of the paintings. Nelson v. Najm, 127 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

These are the trial court's conclusions:

28. Texas recognizes two measures of direct damages for common-law fraud:   the out-of-pocket measure and the benefit-of-the-bargain measure." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). "The out-of-pocket measure is the difference between the value paid and the value received, and the benefit-of-the-bargain measure is the difference between the value as represented and the value received." *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 727–28 (Tex. App.—Houston [lst Dist.] 2012, no pet).

. . .

32. Ms. Scharbauer is entitled to recover her expectancy damages for Clarke Barcus's fraud.   "Texas recognizes two measures of direct damages for common-law fraud:  the out-of-pocket measure and the benefit-of—the-bargain measure." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). "The out-of-pocket measure is the difference between the value paid and the value received, and the benefit-of-the-bargain measure is the difference between the value as represented and the value received." *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 727–28 (Tex. App.—Houston [lst Dist.] 2012, no pet).

33.   When a parties' (sic) damages depend on the value of personal property, "[f]air market value has been defined as the price that the property would bring when it is offered for sale by one who desires, but

fraud and conspiracy to commit fraud.  Because the parties do not address in their briefs the $113,638.50 difference between the calculation in findings 29 and 30 and the amount awarded in the judgment, we do not address it either.

54

is not obligated to sell, and is bought by one who is under no necessity of buying it." *Burns v. Rochon*, 190 S.W.3d 263, 270 (Tex. App.—Houston [lst Dist.] 2006, no pet); *see also United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 146–48 (Tex.1997); *Wise v. SR Dallas, LLC*, 436 S.W.3d 402, 412 (Tex. App.—Dallas 2014, no pet).

34. Ms. Mohle testified that she sold each painting from a willing [seller] to a willing [buyer].[19] She was under no directive to sell the paintings within a certain time frame or to a certain buyer. She brokered arm's length transactions among disinterested parties, and the resulting price establishes value for purposes of calculating damages.

35. Further, the Court finds that this represents the value of the art at the time of the fraud. There is no reason to believe that the value changed between the time of the sale to Ms. Scharbauer and the later sale by Ms. Mohle. The value of the art here did not materially fluctuate in value within that time period.

36. Clarke . . . [is] liable to Ms. Scharbauer for $250,750.50 as a result of Clarke Barcus's fraud, or in the alternative, to restore Ms. Scharbauer to her original position before the sale and purchase of the paintings. *Nelson v. Najm*, 127 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

Sarah's primary evidence of damages came through Brenda Simonson-Mohle. Mohle has been involved in selling fine art since 1980, advising clients regarding buying and selling art since 1987, and brokering art since 1990. She has also appraised art since 1987. Since 1980, she has been certified by the International Society of Appraisers to appraise personal property and fine art. Sarah offered Mohle as an expert on the commercially reasonable sale of art such as the artwork at issue and that Mohle's sales of the artwork were accomplished in a commercially

---

[19] The text states, "from a willing *buyer* to a willing *seller*," but neither party asserts a different intended meaning than the standard legal formulation.

reasonable manner.  In addition to testifying about her qualifications and the details of the transactions, Mohle testified she was placed under no restrictions by Sarah or her lawyers and was personally motivated to obtain the highest price because she was paid on commission.  She testified the resulting sales were between a willing seller and willing buyers none of whom were under compulsion to sell or buy.  She testified unsuccessful auction of artwork negatively affects the value of the artwork in a market for up to ten years and that occurred with Cyrus's art that had not sold at the previous auction and how that and other considerations affected the amounts at which she set reserve prices for the art sold at auction.  Based on Mohle's testimony, the trial court determined the prices obtained by Mohle were fair market value at the time of the sales in 2018 and at the time of Sarah's purchase in August 2016.

Appellants challenge Sarah's proof of market value which did not use Mohle as an expert on her opinion of the fair market value of the artwork.  (Appellants had successfully obtained the trial court's favorable ruling excluding Mohle's direct testimony on her opinion of fair market value based on non-disclosure, and neither party challenges the trial court's rulings on Mohle's expertise for the scope of her trial testimony which was admitted).  Appellants challenge the legal sufficiency of proof of commercially reasonableness of sales as proving market value and proving market value at a time over a year before the sales.  Appellants principally rely on

56

*Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 663 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Actual sales price is not evidence of fair market value when circumstances indicate the sale is out of the ordinary in some way."). However, appellants do not dispute Mohle's testimony that the sales were commercially reasonable or point to any evidence in the record that the sales were "out of the ordinary in some way." *Id.* A reasonable factfinder could decide Mohle's testimony about the reasonably commercial sales conformed to the legal definition and theory of fair market value established by willing sellers and buyers under no compulsion. *See Edlund v. Bounds*, 842 S.W.2d 719, 728 (Tex. App.–Dallas 1992, writ denied) ("[T]he actual sales price of property provides some evidence of fair market value."); *see also Flukinger v. Straughan*, 795 S.W.2d 779, 790 (Tex. App.–Houston [14th Dist.] 1990, writ denied) ("In most cases where personal property valuation are involved, evidence of what an article or commodity actually sold for is some evidence of market value."). A reasonable factfinder could credit Mohle's testimony regarding the sufficient stability of the art market to conclude the sales in 2018 established fair market value a little more than a year earlier in 2016. Although Sarah's proof of fair market value was based on individual sales rather than an expert's global opinion, her approach was entirely consistent with the legal definition and theory of market value and we cannot conclude that it lacks sufficient evidentiary support in the record.

Lastly, we note appellants do not challenge the trial court's alternate theory for awarding damages for the artwork fraud in conclusion of law 36 ("Clarke and Cyrus Barcus are therefore jointly and severally liable to Ms. Scharbauer for $250,750.50 . . . in the alternative, to restore Ms. Scharbauer to her original position before the sale and purchase of the paintings. *Nelson v. Najm*, 127 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)."). But appellants' challenge to the sufficiency of the evidence of market value is equally applicable to the facts supporting the *Nelson* alternate basis for recovery which we have already rejected. For all these reasons, we reject appellants' challenge to the sufficiency of the evidence and theory of Sarah's damages for the artwork fraud.

### *Artwork Conspiracy*

Appellants challenge the evidence of Cyrus's participation in a conspiracy with Clarke to defraud Sarah regarding the sale of the artwork to Sarah. Appellants argue there is no evidence of conspiracy because there is no evidence of an underlying intentional tort citing *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex. 1996) ("Because a conspiracy requires intent, parties cannot conspire to be negligent.").

The supreme court articulated the elements of conspiracy in *Tri v. J. T. T.*:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds on the object or course of action;

58

(4) one or more unlawful, overt acts; and

(5) damages as a proximate result.

162 S.W.3d 552, 556 (Tex. 2005). Appellants argue, "Sarah presented no evidence that the information about the art's value that Cyrus provided was false." Appellants argue Sarah admitted she never discussed with Cyrus the value of the art and Cyrus testified he thought the market values of each piece of art were the prices in the bills of sale or more. Appellants argue none of Cyrus's conduct was fraudulent. Appellants then argue Clarke's conduct was not fraudulent, but we have already rejected this contention above.

Appellants' argument challenges the fourth element of conspiracy, that there is no evidence of an underlying unlawful, overt act. *Tri*, 162 S.W.3d at 556. We have already decided there is sufficient evidence to support the trial court's decision that Clarke's representation that he had appraisals for the sales prices in the bills of sale was a fraudulent misrepresentation that the prices in the bills of sale were the market value of each painting. Accordingly, we reject appellants' challenge to the trial court's finding that Clarke conspired with Cyrus to commit Clarke's fraud on Sarah in the sale of the artwork. For all these reasons, we reject appellants' challenges in their fourth issue.

## D. Fifth Issue: Unjust Enrichment and Money Had and Received

In their fifth issue, appellants challenge the award in the final judgment for unjust enrichment and money had and received. We need not decide appellants'

fifth issue for the following reasons. The trial court awarded damages for unjust enrichment as an alternative to the breach of contract claim.[20] We have affirmed Sarah's recovery for breach of contract in a greater amount of recovery because among other reasons it includes the recovery of attorney's fees. "[W]here the prevailing party fails to elect between alternative measures of damages, the court should utilize the findings affording the greater recovery and render judgment accordingly." *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987); *Lundy v. Masson*, 260 S.W.3d 482, 506 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("When, as in this case, the plaintiff establishes separate theories of liability based on the same facts and fails to elect between more than one recovery, the appellate court should render judgment on the finding affording the greatest recovery."). Because we affirm the judgment's greater award of damages for breach of contract, we strike from the judgment the paragraph awarding alternative, lesser damages for unjust enrichment and money had and received. *See supra* n. 20.

---

[20] The judgment provides,

> ORDERED that, *in the alternative to the above-described breach of contract claim and damages*, Defendants Clarke Barcus, C-2-It Rental, Inc., and 440 Equipment, LLC shall be jointly and severally liable to Plaintiff Sarah Scharbauer in the amount of $711,000 based on her claims for unjust enrichment and money had and received. Plaintiff shall be entitled to recover pre-judgment interest in the amount of five percent (5) per annum in simple interest, accruing from the date suit was filed on July 7, 2017 through the date judgment is entered.

(emphasis added). The amount awarded, $711,000, is the principal amount of contractual indebtedness.

## III.
### CONCLUSION

For the reasons stated above, we modify the judgment by striking from the judgment the paragraph awarding alternative, lesser damages for unjust enrichment and money had and received.  As modified, we affirm the judgment of the trial court.


/David Evans/
DAVID EVANS
JUSTICE, ASSIGNED


191121F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CLARKE BARCUS, C-2-IT
RENTAL, INC., 440 EQUIPMENT,
LLC AND CYRUS BARCUS,
Appellants

No. 05-19-01121-CV     V.

SARAH SCHARBAUER, Appellee

On Appeal from the 134th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. Dc-17-08105.
Opinion delivered by Justice Evans.
Justices Myers and Nowell
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

We strike from the judgment the following paragraph:

ORDERED that, *in the alternative to the above-described breach of contract claim and damages*, Defendants Clarke Barcus, C-2-It Rental, Inc., and 440 Equipment, LLC shall be jointly and severally liable to Plaintiff Sarah Scharbauer in the amount of $711,000 based on her claims for unjust enrichment and money had and received. Plaintiff shall be entitled to recover pre-judgment interest in the amount of five percent (5) per annum in simple interest, accruing from the date suit was filed on July 7, 2017 through the date judgment is entered.

It is **ORDERED** that, as modified, the judgment of the trial court is **AFFIRMED**.

62

It is **ORDERED** that appellee SARAH SCHARBAUER recover her costs of this appeal from appellant CLARKE BARCUS, C-2-IT RENTAL, INC., 440 EQUIPMENT, LLC AND CYRUS BARCUS.

Judgment entered April 15, 2021.